IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JENNIFER MAZZARELLO,   *

   Plaintiff,     *

v.           *

             Civil Action No. AMD 02 CV 3576

LUCENT TECHNOLOGIES INC., *

   Defendant.    *

*  *  *  *  *  *  *  *  *  *  *  *  *

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Robert R. Niccolini
McGuireWoods LLP
7 St. Paul Street, Suite 1000
Baltimore, Maryland 21202
410-659-4400

Counsel for Lucent Technologies Inc.

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................1

II.    STATEMENT OF FACTS...........................................................................2

       A.  Plaintiff's Commencement of Employment with Lucent .....................2

       B.  Plaintiff's Supervision by Christopher Herr:  October 1998-
           August 1999 ..................................................................................3

       C.  Plaintiff's Interim Supervision:  October of 1999 to
           November of 2000 .........................................................................6

       D.  Downsizing at Lucent during 2001 ................................................8

       E.  Plaintiff's Difficulties with Mr. Moore and Ms. Worley:
           November of 2000 to August of 2001 ...........................................9

       F.  Circumstances of Plaintiff's Resignation:  August of 2001 ..................12

III.   STANDARDS ON SUMMARY JUDGMENT............................................15

IV.    LUCENT SHOULD BE GRANTED SUMMARY JUDGMENT
       ON PLAINTIFF'S CLAIMS OF SEXUAL HARASSMENT ...................16

       A.  Plaintiff's Sexual Harassment Claim is Barred by the Statute
           of Limitations...............................................................................16

       B.  Plaintiff's Sexual Harassment Allegations Related to Chris
           Herr Are Not Actionable Because Defendants Have Established
           An Affirmative Defense, and Plaintiff's Allegations After
           August of 1999 Are Insufficient to Give Rise to a Hostile Work
           Environment..................................................................................18

V.     LUCENT SHOULD BE GRANTED SUMMARY JUDGMENT
       ON PLAINTIFF'S CLAIMS OF GENDER DISCRIMINATION
       AND RETALIATION ....................................................................................21

       A.  Plaintiff is Unable to Establish a Prima Facie Case of Gender
           Discrimination ..............................................................................22

       B.  Plaintiff is Unable to Establish a Prima Facie Case of Retaliation .......................28

C.  Plaintiff is Unable to Establish that Lucent's Legitimate, Non-Discriminatory and Non-Retaliatory Reasons for its Actions were Mere Pretext for Either Intentional Gender Discrimination or Retaliation.................................................................................32

VI.  CONCLUSION.................................................................................34

APPENDIX OF EXHIBITS .................................................................36

## TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ........................................................15

Boarman v. Sullivan, 769 F. Supp. 904 (D. Md. 1991) .........................................15

Bristow v. Daily Press, Inc., 770 F.2d 1251 (4th Cir. 1985) ................................23, 25,
.............................................................................................................................26

Bulington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) ...................................23

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548,
91 L.Ed.2d 265 (1986) ...........................................................................................15

Chappell v. School Board of the City of Virginia Beach, 12 F. Supp. 2d
509 (E.D. Va. 1998) ...............................................................................................32

Chika v. Planning Research Corp., 179 F.Supp.2d 575 (D. Md. 2002) ...............21, 22,
.............................................................................................................................32

Church v. State of Maryland, 180 F. Supp. 2d 708 (D. Md. 2002) .......................19, 20,
.............................................................................................................................29, 30

Copeland v. Sears, Roebuck and Co., 25 F. Supp. 2d 412 (S.D.N.Y. 1998) .........34

Dachman v. Shalala, 46 F.Supp.2d 419 (D. Md. 1999) ........................................33

Dowe v. Total Action Against Poverty in Roanoke Valley,
145 F.3d 653 (4th Cir. 1998) .................................................................................29, 30,
.............................................................................................................................31

E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A.,
678 F.Supp 567 (D. Md. 1988) ..............................................................................16

Evans v. Technologies Applications & Service Co., 80 F.3d
954 (4th Cir. 1996) ................................................................................................15, 24,
.............................................................................................................................33

Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998) ...............19

Felty v. Graves-Humpheys Co., 818 F.2d 1126 (4th Cir. 1987) ...........................15

Finnegan v. Dept. of Public Safety & Corr. Servs., 184 F. Supp.2d
457 (D. Md. 2002) .................................................................................................18, 19,
.............................................................................................................................22

Francis v. Board of School Commissioners of Baltimore City,
32 F. Supp. 2d 316 (D. Md. 1999)................................................................21

Gibson v. Old Town Trolley Tours, 160 F.3d 177 (4th Cir. 1988) ......................................34

Grizzle v. Travelers Health Network, Inc., 14 F.3d 261 (5th Cir. 1994)..............................31

Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745 (4th Cir. 1996) ..............................29

Jackson v. Maryland, 171 F. Supp. 2d 532 (D. Md. 2001)....................................................16

Jurgens v. EEOC, 903 F.2d 386 (5th Cir. 1990)..................................................................27

Kline v. Certainteed Corp., 205 F. Supp. 2d 468 (D. Md. 2002)........................................19, 21

Langerman v. Thompson, 155 F.Supp.2d 490 (D.Md. 2001)................................................22, 32

Leskinen v. Utz Quality Foods, Inc., 30 F. Supp. 2d 530 (D. Md. 1998)..............................16

Mackey v. Shalala, 43 F.Supp.2d 559 (D. Md. 1999) ...........................................................15

McCain v. Waste Management, Inc., 115 F. Supp. 2d 568 (D. Md. 2000) ...........................16, 27

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ...................................................21

McGee v. Danzig, 2001 U.S. Dist. LEXIS 5862 (D. Md. 2001)...........................................27

Mitchell v. Data General Corp., 12 F.3d 1310 (4th Cir. 1993)............................................22

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101,
122 S. Ct. 2061 (2002)........................................................................................16

Nichols v. Comcast Cablevision of Maryland, 84 F. Supp. 2d 642
(D. Md. 2000) .....................................................................................................23

Nichols v. Harford County Board of Education, 189 F. Supp. 2d 325
(D. Md. 2002) .....................................................................................................21, 22,
..........................................................................................................................25, 26,
..........................................................................................................................29

Orenge v. Veneman, 218 F. Supp. 2d 758 (D. Md. 2002)....................................................18, 19,
..........................................................................................................................31

Settle v. Baltimore County, 34 F.Supp.2d 969 (D. Md. 1999) .............................................24, 34

Taylor v. Virginia Union University, 193 F.3d 219 (4th Cir. 1999)......................................25, 26

Wagner v.Wheeler, 13 F.3d 86 (4th Cir. 1993) ...................................................................34

Defendant Lucent Technologies Inc. ("Lucent"), through undersigned counsel, respectfully submits this Memorandum of Points and Authorities, with attached Affidavit and Exhibits, in support of its Motion for Summary Judgment. Plaintiff is unable to put forward sufficient evidence to support her claims of gender discrimination, retaliation or hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). Lucent's Motion for Summary Judgment should therefore be granted and Plaintiff's Complaint should be summarily dismissed with prejudice as a matter of law.

## I.    <u>INTRODUCTION</u>

In August of 2002, Plaintiff Jennifer Mazzarello ("Plaintiff"), a former employee of Lucent, filed the instant Complaint in the Circuit Court for Anne Arundel County, Maryland, and Lucent thereafter timely removed the matter to this Court. The Complaint alleges that Plaintiff was discriminated against on the basis of her gender, retaliated against for complaints of harassment and gender discrimination, and otherwise subjected to a sexually hostile work environment, all in violation of Title VII. Discovery has now been completed, and the record reveals that there is no legal or factual basis for Plaintiff's claims and subjective beliefs.

As explained more fully below, during the summer of 1999, Plaintiff complained to Lucent about the conduct of her supervisor, Chris Herr, and Lucent immediately took prompt and effective remedial action. Thereafter, the conduct did not reoccur, and Plaintiff's claims for sexual harassment are therefore barred by both the <u>Faragher</u> defense and by the statute of limitations. Ultimately, Plaintiff voluntarily left Lucent in September of 2001 for what she perceived to be a better opportunity with another company. There is no evidence that any of Lucent's actions or decisions were related in any way to Plaintiff's gender or constituted retaliation for any complaints made by Plaintiff. In addition, Plaintiff cannot produce any

evidence that Defendants' legitimate, non-discriminatory and non-retaliatory reasons for its actions were a mere pretext for intentional discrimination or retaliation. Accordingly, summary judgment in this matter is appropriate and should be granted in favor of Defendant.

## II.    STATEMENT OF FACTS

### A.    Plaintiff's Commencement of Employment with Lucent

Lucent is engaged in the design, manufacture and sale of telecommunications equipment, and maintains a sales office in Linthicum, Maryland. (See *Complaint at ¶ 4; Answer at ¶ 4*). Plaintiff was initially hired by Lucent as a temporary employee in early 1997, and became a permanent employee in August of 1997. (*Plaintiff's Deposition, attached hereto as Exhibit A, at 12 lines 11-13 and 13 lines 7-12*). Lucent employs a "band-level" system, designating non-union employees according to the following levels of progression in ascending order: A-1, A-2, A-3, A-4, A-5, B, C, D and E, with only the higher designation being an officer in the Company (*Plaintiff Depo. (Ex. A) at 38 line 13 – 39 line 1; Deposition of Tom Moore, attached hereto as Exhibit B, at 12 line 8 – 13 line 1*). Plaintiff was permanently hired at the A-2 level as an account manager in August of 1997, and continued to work as an account manager until her resignation effective September 6, 2001. (*Plaintiff Depo. (Ex. A) at 13 line 17 – 14 line 10, 29 lines 3-7 and 41 lines 1-3*).

Plaintiff was hired by Mr. Dick McFaul and initially reported to Mr. T.G. Robinson. (*Plaintiff Depo. (Ex. A) at 15 lines 2-3 and 17 lines 13-15*). After a year, Plaintiff then reported to Mr. Rick Smith for just under a year. (*Plaintiff Depo. (Ex. A) at 29 lines 8-17 and 33 line 20 – 34 line 1*). While under Mr. Smith's supervision, Plaintiff became an account manger on the

Y2K team for Verizon,[1] responsible for addressing year 2000 software concerns.  (*Plaintiff Depo. (Ex. A) at 31 lines 3-15*).

### B.    Plaintiff's Supervision by Christopher Herr: October 1998-August 1999

In late 1998, Mr. Christopher Herr was promoted within Lucent and transferred from Connecticut to the Linthicum, Maryland location.  (*Deposition of Christopher Herr, attached hereto as Exhibit C, at 29 line 17 – 30 line 9*).  Mr. Herr was made a C-level manager, and in this capacity oversaw various projects, including the Verizon Y2K project.  (*Plaintiff Depo. (Ex. A) at 45 line 8 – 46 line 5*).  As of October of 1998, Mr. Herr became Plaintiff's direct supervisor. (*Plaintiff Depo. (Ex. A) at 42 line 20 – 43 line 1*).

Mr. Herr had four employees reporting to him on the Verizon Y2K team: Jim McIlvain, Larry Dorr, Plaintiff and Lisa Bryan.  (*Plaintiff Depo. (Ex. A) at 108 line 20 – 109 line 12*).  Ms. Bryan was a coworker and friend of Plaintiff; Ms. Bryan has also brought a lawsuit for harassment, discrimination and retaliation against Lucent, and is represented in that matter by the same counsel as Plaintiff.  (*Plaintiff Depo. (Ex. A) at 75 line 14 – 76 line 2*).[2]

While under Mr. Herr's supervision, from approximately October of 1998 to August of 1999, Plaintiff alleges that she was sexually harassed and otherwise subjected to a hostile work environment by Mr. Herr.  Mr. Herr denies most, but not all, of Plaintiff's allegations.  Ignoring these denials solely for purposes of summary judgment, however, the relevant allegations before the Court are as follows:

_____

[1] Verizon was formerly known as Bell Atlantic, and is referenced in the deposition testimony at different points as either Verizon or Bell Atlantic depending upon the time frame.  For ease of reference, the name "Verizon" shall be used throughout this Memorandum.

[2] Ms. Bryan's case against Lucent, which is entitled "Lisa Bryan v. Lucent Technologies, Inc., Civil Action No. 1:03-CV-00265-AMD," is currently pending before this Court.  Discovery is not scheduled to close in Ms. Bryan's case until July 21, 2003.

1.    In December of 1998, Plaintiff alleges that she asked to be assigned an additional project, and that Mr. Herr responded that he would give her "enough rope to hang herself;" Mr. Herr nevertheless did in fact assign Plaintiff the requested project.  (*Plaintiff Depo. (Ex. A) at 97 lines 1-6 and 98 line 4 – 99 line 8*).

2.    In December of 1998, Plaintiff alleges that Mr. Herr accused her of filing a false voucher for excessive mileage.  (*Plaintiff Depo. (Ex. A) at 99 line 12 – 102 line 9*).

3.    In January of 1999, Plaintiff alleges that Mr. Herr commented to Plaintiff and Ms. Bryan that he had a customer who would take trips to a nudist camp, and that this customer gave him a blowup doll as a going-away present.  (*Plaintiff Depo. (Ex. A) at 102 lines 10-21*).

4.    In January of 1999, Plaintiff alleges that Mr. Herr held a team lunch with two male employees, but did not invite Plaintiff or Ms. Bryan.  When confronted, Mr. Herr took Plaintiff and Ms. Bryan to lunch shortly thereafter.  (*Plaintiff Depo. (Ex. A) at 106 line 10 – 108 line 11*).

5.    On April 13, 1999, Plaintiff alleges that Mr. Herr traveled to a hotel in New Jersey with Plaintiff and Ms. Bryan.  When he discovered that he did not have a room reserved, he allegedly asked if he would be sharing a room with Plaintiff or with Ms. Bryan.  Plaintiff responded that he would be sharing a room with neither of them.  (*Plaintiff Depo. (Ex. A) at 111 line 19 – 112 line 6 and 113 lines 1-6*).

6.    On April 28, 1999, during a mid-year review, Plaintiff alleges that Mr. Herr advised her that all she needed to do to get ahead was to keep her desk clean, dress like she was going to see a customer everyday, and wear a "Mona Lisa" smile.  (*Plaintiff Depo. (Ex. A) at 114 lines 10-15*).

7.    From October of 1998 to July 1999, Mr. Herr allegedly referred to Plaintiff as "little girl" and to Ms. Bryan as "big girl."  (*Plaintiff Depo. (Ex. A) at 118 lines 11-17*).

8.    From November of 1998 until July of 1999, Mr. Herr, on approximately three to five occasions, and in response to favorable business reports presented by Plaintiff, allegedly said: "tell me more, I'm getting a woody." (*Plaintiff Depo. (Ex. A) at 121 lines 7-21*).

9.    On three occasions during the course of his supervision of her, Plaintiff alleges that Mr. Herr stated that a female supervisor made his "sphincter twitch," and then clenched and opened his fist.  (*Plaintiff Depo. (Ex. A) at 122 line 5 – 123 line 16*).

4

10.  During his supervision of Plaintiff, Plaintiff alleges that Mr. Herr would comment to her and Ms. Bryan that certain phone conferences were so long that he needed to relieve himself in an empty bottle, and that on approximately two occasions when Plaintiff was on the phone, Mr. Herr would walk by and wave an empty bottle.  (*Plaintiff Depo. (Ex. A) at 124 lines 6-15 and 127 lines 7-18*).

11.  On one occasion during his supervision of her, Plaintiff alleges that Mr. Herr, while packing in his office, displayed his underwear while Plaintiff was across the table from him.  (*Plaintiff Depo. (Ex. A) and 128 line 4 – 131 line 8*).

12.  In late April of 1999, Plaintiff alleges that Mr. Herr yelled at her in front of a Verizon representative without cause.  (*Plaintiff Depo. (Ex. A) at 131 lines 9-14 and 133 line 19 – 135 line 16*).

13.  On July 9, 1999, Plaintiff alleges that she crossed her legs in a meeting, and that Mr. Herr asked her if she was trying to show him her legs.  (*Plaintiff Depo. (Ex. A) at 143 lines 6-16*).

14.  In July of 1999, Plaintiff alleges that Mr. Herr and Plaintiff traveled together, that Mr. Herr saw Plaintiff at breakfast with a strange man, and that Mr. Herr later asked her if she had had sexual relations with the man.  (*Plaintiff Depo. (Ex. A) at 143 line 20 – 145 line 12*).

15.  During his supervision of her, Plaintiff alleges that, on five to ten occasions, Mr. Herr would refer to female managers as having their "panties in a ruffle."  (*Plaintiff Depo. (Ex. A) at 145 line 13 – 146 line 1*).

On May 27, 1999, Plaintiff met with Mr. Herr about his behavior, and indicated to him that his language and actions were inappropriate.  Later that same day, after considering Plaintiff's complaints, Mr. Herr sent Plaintiff an email apologizing for his conduct and asking that she "continue to keep the bar high."  (*Plaintiff Depo. (Ex. A) at 139 line 9 – 140 line 6 and at Exhibit 7; Herr Depo. (Ex. C) at 118 line 17 – 121 line 5 and at Exhibit 1*).

Despite Mr. Herr's apology, however, Plaintiff continued to feel uncomfortable.  That summer, Ms. Bryan then complained about Ms. Herr's conduct to his supervisor, Ms. Sarah Brazier, and Human Resources Director Ed May was assigned to investigate the allegations.  Mr.

May interviewed Plaintiff, who also complained about Mr. Herr's conduct. (*Plaintiff Depo. (Ex. A) at 157 line 12 – 158 line 11*).

Following his investigation, Mr. May reprimanded Mr. Herr, told him unequivocally that his behavior was unacceptable, and informed him that if such behavior did not stop immediately, he would be terminated. (*Herr Depo. (Ex. C) at 141 line 11 – 142 line 10*). In addition, Mr. May ordered Mr. Herr to undergo appropriate management training, and Mr. Herr did in fact undergo three full days of coaching and diversity training, including training on male-female relations and sexual harassment. (*Herr Depo. (Ex. C) at 14 line 9 – 22 line 10 and 144 line 7 – 145 line 5*). As part of her complaint, Plaintiff also requested a transfer from Mr. Herr's supervision on August 1, 1999, and Lucent granted Plaintiff's request, transferring her from Mr. Herr's supervision, less than one month later. (*Plaintiff Depo. (Ex. A) at 48 line 16 – 49 line 15; Herr Depo. (Ex. C) at 147 line 4 – 148 line 18*).

Despite such corrective action, Mr. Herr took no adverse action against Plaintiff during this time period. Quite to the contrary, in late May or early summer of 1999, Mr. Herr approved Plaintiff's promotion from an A-2 account manager to an A-4 account manager. (*Plaintiff Depo. (Ex. A) at 47 line 20, 48 line 9 and 161 lines 10-17*). After Plaintiff complained and was transferred from his supervision, Mr. Herr also completed Plaintiff's performance evaluation in November of 1999. By her own admission, and despite her complaint, Mr. Herr gave Plaintiff a very good evaluation. (*Plaintiff Depo. (Ex. A) at 160 lines 14-21*).

C.     **Plaintiff's Interim Supervision: October of 1999 to November of 2000**

After being reprimanded and sent for training, Plaintiff claims that Mr. Herr made several derogatory comments about his discipline. Specifically, shortly after her transfer from his supervision, Plaintiff alleges that she overheard Mr. Herr on several occasions talking on the

phone about his required sensitivity training as "charm school." (*Plaintiff Depo. (Ex. A) at 85 line 21 – 87 line 8*). Plaintiff also claims that in September of 1999, Mr. Herr saw Mr. May in the Linthicum office and greeted him with: "that's the man who ruined my career." (*Plaintiff Depo. (Ex. A) at 87 line 17 – 88 line 12*). Finally, Plaintiff claims that in late 1999, a co-worker commented to her that he understood she was suing Lucent for sexual harassment when she in fact was not. (*Plaintiff Depo. (Ex. A) at 88 line 16 – 89 line 8*). Mr. Herr denies these allegations. (*Herr Depo. (Ex. C) at 201 lines 3-18 and 203 lines 12-17*).

Upon being transferred from Mr. Herr's supervision, Plaintiff was moved to Mr. McFaul's team, and assigned the tasks of Network Equipment Building Systems ("NEBS") compliance and customer satisfaction surveys. (*Plaintiff Dep. (Ex. A) at 49 line 19 – 50 line 10*). Plaintiff was supervised by Mr. McFaul for approximately a year, and then by Mr. John Donaldson for several months. Plaintiff had no complaints about her time under the supervision of Mr. McFaul and Mr. Donaldson. (*Plaintiff Dep. (Ex. A) at 52 lines 1-16 and 57 line 6-20*).

Mr. Donaldson was then transferred to another position in late 2001. On November 15, 2001, Ms. Pam Worley was promoted into Mr. Donaldson's position and began to supervise Plaintiff. (*Plaintiff Depo. (Ex. A) at 52 lines 1-16 and 57 lines 6-20; Deposition of Pam Worley attached hereto as Exhibit D, at 8 lines 1-4 and 19 lines 7-13*). Plaintiff retained the same responsibilities under Ms. Worley as she had under Mr. McFaul and Mr. Donaldson, and Ms. Worley remained Plaintiff's supervisor until Plaintiff's resignation in early September of 2001. (*Plaintiff Depo. (Ex. A) at 61 lines 15-21 and 62 line 17 – 63 line 2*).

At the time of her transfer from Mr. Herr's team, Mr. Tom Moore was serving as the Operations Director and Executive Assistant for the North America East Sales Vice President. (*Moore Depo. (Ex. B) at 9 lines 4-19*). In this capacity, Mr. Moore was asked to speak with

Plaintiff about difficulties she had experienced with Mr. Herr. (*Moore Depo. (Ex. B) at 21 line 13 – 24 line 14*). Mr. Moore initially spoke with Mr. May, Human Resources Director, and was made aware in a very general fashion of the situation with Mr. Herr. (*Moore Depo. (Ex. B) at 25 line 9 – 26 line 8*).

Plaintiff alleges that, during this first meeting, Mr. Moore brought up the situation with Mr. Herr, and asked her about her husband and if she was seeing a therapist, questions that upset her. (*Plaintiff Depo. (Ex. A) at 170 lines 5-15*). Mr. Moore recalls little discussion about Mr. Herr, however, but instead remembers that the discussion focused on Plaintiff's career objectives and her goals at Lucent. Regardless of the difference in recollection, however, both agree that Mr. Moore offered to provide Plaintiff with counseling and mentoring, and that, after consideration, Plaintiff accepted. (*Plaintiff Depo. (Ex. A) at 173 lines 13-19; Moore Depo. (Ex. B) at 34 lines 9-17 and 38 lines 1-19*).

In June of 2000, Mr. Moore was promoted to the position of Vice President of Sales Realization on the Verizon team. (*Moore Depo. (Ex. B) at 5 lines 11-16*). In this position, Plaintiff was now within his indirect line of supervision, and Mr. Moore therefore informed Plaintiff that he would be unable to continue to mentor her for fear of showing favoritism within his department. (*Moore Depo. (Ex. B) at 54 line 21 – 55 line 5 and 82 line 11 – 83 line 4*). Mr. Jelani Rucker, a B-level manager, was therefore assigned as Plaintiff's new mentor in late 2000. (*Moore Depo. (Ex. B) at 99 lines 1-8*).

### D.    Downsizing at Lucent during 2001

By late 2000, the economy in general, and the telecommunications market in particular, began to experience a severe downturn. (*Plaintiff Depo. (Ex. A) at 25 lines 4-5*). As a result, Lucent commenced a downsizing program in late 2000, and continued with even more extensive

downsizing through 2001. (*Plaintiff Depo. (Ex. A) at 25 line 11 – 26 line 4*). Specifically, the Verizon team was downsized in February and then again in March of 2001. (*Affidavit of Tom Moore, attached hereto as Exhibit E, at ¶ 3*). By the summer of 2001, as the downturn intensified, Lucent offered a company-wide early retirement package in an effort to encourage further voluntary downsizing. (*Plaintiff Depo. (Ex. A) at 231 line 20 – 233 line 4 and 289 lines 1-8; Moore Affidavit (Ex. E) at ¶ 3*). When this offer failed to achieve a sufficient headcount reduction, the Verizon team then went through another downsizing in August of 2001. Thus, prior to Plaintiff's effective resignation, the Verizon team at Lucent was downsized in February, March and August of 2001. (*Moore Affidavit (Ex. E) at ¶ 3*).

During this period, candidates for downsizing were identified based upon performance criteria. Plaintiff, however, was never once in jeopardy of losing her job during these downsizings. (*Moore Depo. (Ex. B) at 152 line 16 - 153 line 11; Moore Affidavit (Ex. E) at ¶ 4*). At the time of her resignation effective September of 2001, Plaintiff had not been scheduled to be laid off, and had in fact made it through all three rounds of layoffs on the Lucent Verizon team during 2001. (*Moore Depo. (Ex. B) at 225 line 18 – 226 line 3; Moore Affidavit (Ex. E) at ¶ 4*).

> **E.** **Plaintiff's Difficulties with Mr. Moore and Ms. Worley: November of 2000 to August of 2001**

Despite the fact that she was clearly never in jeopardy of losing her job, Plaintiff began to perceive difficulties in her relationship with Mr. Moore and, ultimately, her relationship with Ms. Worley. Plaintiff believed that Mr. Moore would speak positively to her face, but then speak negatively behind her back, although she was unaware of any specific comments allegedly made by Mr. Moore. (*Plaintiff Depo. (Ex. A) at 212 lines 9-18*). Plaintiff believed that Mr. Moore asked Ms. Worley to reevaluate Plaintiff's work at the commencement of her supervision of

Plaintiff. (*Plaintiff Depo. (Ex. A) at 218 line 19 – 219 line 3*). Plaintiff also believed that, after she asked Mr. Moore about appropriate dress in the office and he told her that its was alright to dress her age, Mr. Moore then criticized her manner of dressing to others. (*Plaintiff Depo. (Ex. A) at 174 lines 13-21*). Finally, Plaintiff claims that Mr. Moore suggested to her that she set a goal of reaching a B-level promotion, essentially skipping over an A-5 level, within a fairly short period of time. (*Plaintiff Depo. (Ex. A) at 222 lines 14-19 and 223 lines 12-15*). When Plaintiff met with Ms. Worley to discuss this goal, Ms. Worley indicated that the goal was unrealistic, and revised the goal for Plaintiff to seek an A-5 level promotion. (*Worley Depo. (Ex. D) at 133 line 15 – 135 line 19*). Plaintiff evidently felt that Mr. Moore had undermined her by encouraging her to seek an unrealistic goal.

Matters apparently came to a head, at least in Plaintiff's mind, when she was asked to mentor Ms. Kelly Hanlon, Mr. Moore's A-2 level executive assistant. Plaintiff believed that the perception in the office was that Ms. Hanlon's relationship with Mr. Moore was "too close," and that there was a rumor of an improper relationship. Plaintiff advised Ms. Hanlon of this perception, who then became upset and complained to Mr. Moore. Mr. Moore spoke with Plaintiff, who indicated that she did in fact believe that a relationship existed between Mr. Moore and Ms. Hanlon. Mr. Moore denied the existence of a relationship, and asked Plaintiff to stop spreading rumors. (*Plaintiff Depo. (Ex. A) at 199 lines 4-8 and 207 line 7 – 209 line 5; Moore Depo. (Ex. B) at 114 line 1 – 115 line 19*). Plaintiff spoke to Ms. Worley and indicated that she did not wish to mentor Ms. Hanlon. Ms. Worley spoke to Mr. Moore, and Plaintiff was thereafter removed from mentoring Ms. Hanlon. (*Worley Depo. (Ex. D) at 54 lines 17-21 and 55 line 20 – 56 line 6*).

Plaintiff also perceived a few interactions between Mr. Herr and Plaintiff during this time period as major issues.  In April of 2001, Plaintiff took offense when Mr. Herr saw her drinking a vitamin enriched milk-shake in the office kitchen and asked her if she was pregnant.  (*Plaintiff Depo. (Ex. A) at 148 lines 14-20*).  In a similar fashion, on May 11, 2001, at the Company picnic, Plaintiff and Mr. Moore were playing on the same volleyball team against Mr. Herr.  When Mr. Herr spiked the ball at Mr. Moore, he turned to Plaintiff and jokingly said "next time, let's tackle him."  Mr. Moore did in fact tackle Mr. Herr later, and asked Plaintiff why she did not help, which upset Plaintiff.  (*Plaintiff Depo. (Ex. A) at 176 line 11 – 177 line 3, 178 lines 13-17 and 181 line 8 – 182 line 11; Moore Depo. (Ex. B) at 96 line 16 – 98 line 11*).[3]

Ms. Worley and Plaintiff sat down to conduct Plaintiff's mid-year evaluation in 2001, and discussed several issues.  Plaintiff's desire to seek a B-level promotion was discussed, and Ms. Worley indicated to Plaintiff that it had taken her ten years to reach B-level.  As a result, Plaintiff felt that Ms. Worley was discriminating against her because Plaintiff was a young and aggressive woman.  (*Plaintiff Depo. (Ex. A) at 235 line 20 – 236 line 19 and 241 lines 12-21*).

Plaintiff also indicated that she still felt uncomfortable seeing Mr. Herr around the office.  Ms. Worley responded that she did not wish to know the details of what had happened in the past between Mr. Herr and Plaintiff, but offered to physically relocate Plaintiff so that she would never see Mr. Herr, or to transfer Plaintiff to another team.  Plaintiff refused both offers.  (*Worley Depo. (Ex. D) at 22 lines 3-8, 23 lines 1-8, 26 lines 1-17 and 139 lines 4-14*).  Plaintiff then complained that Mr. Herr had never received training despite the alleged incidents, and had been promoted while she remained at the same A-4 level.  In response, Ms. Worley spoke to Mr.

---

[3] Apparently, Plaintiff wished to never see or interact with Mr. Herr again, even though she conceded in her deposition that she did not want Mr. Herr fired as a result of the 1999 incidents, and also conceded that she never asked Lucent to transfer Mr. Herr to another office.  (*Plaintiff Depo. (Ex. A) at 164 line 21 – 165 line 8*).

Moore, who replied that Mr. Herr had not been promoted and had in fact undergone training. Ms. Worley later conveyed these facts to Plaintiff.  (*Worley Depo.(Ex. D) at 31 line 9 – 32 line 4 and 39 line 15 – 40 line 1*).

Following the mid-year evaluation, Plaintiff indicated to Ms. Worley that she did not trust Mr. Moore and did not wish to meet with him alone.  (*Plaintiff Depo. (Ex. A) at 219 lines 7-9*).  Plaintiff also complained to Human Resources about Tom Moore in February, March and June of 2001 in a general fashion.  (*Plaintiff Depo. (Ex. A) at 270 line 16 – 271 line 7 and at Exhibit 3*).  Importantly, however, Mr. Moore was utterly unaware of any complaint made by Plaintiff against him to Human Resources or otherwise.  (*Moore Depo. (Ex. B) at 218 lines 11-21*).[4]

### F.    Circumstances of Plaintiff's Resignation: August of 2001

Throughout her career with Lucent, Plaintiff had always received favorable performance appraisals.  (*Plaintiff Depo. (Ex. A) at 248 lines 17-19*).  By Plaintiff's own admission, however, her main failing was a lack of a technical background.  (*Plaintiff Depo. (Ex. A) at 35 line 15 – 36 line 3*).  Plaintiff also conceded that Mr. Moore had specifically told her that if she wished to advance within Lucent, additional technical experience would be extremely helpful.  (*Plaintiff Depo. (Ex. A) at 267 lines 7-9*).

By the summer of 2001, as a result of downsizing and the early retirement program, Lucent had lost approximately 75% of its technical consultants on the Verizon team.  Mr. Moore believed that serving as a technical consultant would present a good opportunity for Plaintiff to gain important technical expertise.  (*Moore Depo. (Ex. B) at 223 lines 1-11*).  Ms. Worley

---

[4] Ms. Worley was also unaware of any complaint made by Plaintiff against her to Human Resources or otherwise. (*Worley Depo. (Ex. D) at 67 line 19 – 68 line 1*).

viewed the situation in simpler terms: the Verizon team needed technical consultants, and needed good employees, such as Plaintiff, to move into the technical consultant position. (*Worley Depo. (Ex. D) at 140 lines 2-6*). A move into a technical consultant position would have not been a demotion for Plaintiff, but rather a lateral move without any decrease in compensation. (*Moore Depo. (Ex. B) at 222 line 17 – 223 line 16; Worley Depo. (Ex. D) at 142 lines 3-13*). With all of these issues in mind, Mr. Moore and Ms. Worley therefore offered Plaintiff the opportunity to move into a technical consultant position in late summer of 2001. (*Plaintiff Depo. (Ex. A) at 295 line 21 – 296 line 3*).

Rather than viewing this offer as a positive opportunity, however, Plaintiff believed that working as a technical consultant would be an unstable position. Plaintiff assumed that the technical consultants were the first in line for layoff, and also assumed that by moving into a position which she did not know, she would become more at risk for downsizing. (*Plaintiff Depo. (Ex. A) at 264 lines 6-18, 297 lines 7-21 and 299 line 14 – 300 line 2*). Plaintiff's mindset was also affected by her conversations with Ms. Bryan, who had resigned from Lucent earlier in 2001 to accept a job with Signal Corporation. In August of 2001, Ms. Bryan told Plaintiff that she had spoken with Ms. Denise Panyick-Dale, a Lucent public relations manager, who had allegedly informed Ms. Bryan that Plaintiff's job was in jeopardy. Although Plaintiff never spoke with Ms. Panyick-Dale, Plaintiff assumed that Ms. Panyick-Dale somehow heard inside information from Mr. Moore, and therefore believed that the move to a technical consultant position was a precursor to losing her job. (*Plaintiff Depo. (Ex. A) at 251 line 10 – 253 line 14*).

It is unfortunate that Plaintiff chose to rely exclusively upon the representations of Ms. Bryan rather than speaking directly to Ms. Panyick-Dale, as Ms. Panyick-Dale states unequivocally that she never advised Ms. Bryan that Plaintiff's job was in jeopardy or that

Plaintiff had been marked for downsizing. (*Deposition of Denise Panyick-Dale, attached hereto as Exhibit F, at 25 line 12 – 27 line 6*).[5]    Based solely upon Ms. Bryan's representations, however, Plaintiff decided to resign from Lucent and take a position working with Ms. Bryan at her new employer, Signal Corporation.  Plaintiff submitted her resignation letter on August 23, 2001, indicating in writing that the position at Signal "represents a positive move towards fulfilling my career goals." (*Plaintiff Depo. (Ex. A) at 301 lines 7-18, 302 lines 1-5 and Exhibit 9*).  Plaintiff also informed Ms. Worley that she was leaving for a better salary, and on her Lucent exit interview form indicated that she was leaving for a 22% increase in pay at Signal. (*Plaintiff Depo. (Ex. A) at 305 line 3 – 306 line 8 and Exhibit 10; Worley Depo. (Ex. D) at 62 lines 2-14*).[6]

Based upon the foregoing, Plaintiff contends that her career at Lucent "flat-lined" as a result of her gender and her complaints, at the same time that two male employees (Marcello Barros and Paul Kates) were promoted. (*Plaintiff Depo. (Ex. A) at 280 line 19 – 281 line 7 and 290 lines 3-16*).[7]    Plaintiff also maintains that her "job was taken away" in retaliation for her complaints and because she was a woman. (*Plaintiff Depo. (Ex. A) at 200 lines 4-15*).  Plaintiff

---

[5] In fact, Ms. Panyick-Dale at the time was merely a public relations manager, and thus had no access to information about management's downsizing decisions. (*Panyick-Dale Depo. (Ex. F) at 6 line 11 – 7 line 3*).

[6] On her application at Signal Corporation, Plaintiff likewise indicated that she was leaving Lucent to work at Signal for a "better opportunity." (*Plaintiff Depo. (Ex. A) at 309 line 15 – 311 line 2 and Exhibit 11*).  Unfortunately, Signal was not immune to the economic downturn, and Plaintiff lost her job at Signal by late November of 2001, less than three months after leaving Lucent. (*Plaintiff Depo. (Ex. A) at 329 lines 9-13*).  If things had not gone so disastrously for Plaintiff at Signal, one can only wonder if Plaintiff would have ever even brought the present lawsuit against Lucent.

[7] In fact, Mr. Barros and Mr. Kates were no manner similarly situated to Plaintiff.  Both had Masters of Business Administration degrees ("MBA"), a degree which Plaintiff did not possess, and both were ranked significantly higher than Plaintiff among the Verizon team A-level managers. (*Moore Affidavit (Ex. E) at ¶¶ 6 and 8*).  Both were in direct sales, as opposed to sales support like Plaintiff. (*Moore Affidavit (Ex. E) at ¶ 7*).  Most importantly, neither were under the supervision of either Mr. Moore or Ms. Worley. (*Moore Affidavit (Ex. E) at ¶ 5*).

concedes, however, that after her resignation, her job duties were passed along to Ms. Toby Adams, who is also female. (*Plaintiff Depo. (Ex. A) at 255 line 19 – 256 line 11*).

### III.    STANDARDS ON SUMMARY JUDGMENT

Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed.R.Civ.P.56.  To defeat a motion for summary judgment, Plaintiff must produce more than a mere scintilla of evidence: "[i]f the evidence is merely colorable, or not significantly probative, summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted).  Plaintiff's unsupported speculation, conclusory statements and self serving assertions are not sufficient to defeat a motion for summary judgment. <u>See</u> <u>Evans v. Technologies Applications & Service Co.</u>, 80 F.3d 954, 960 (4th Cir. 1996); <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987).  A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial and entitles the moving party to summary judgment.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an important part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  <u>See</u> <u>Mackey v. Shalala</u>, 43 F.Supp.2d 559, 564 (D. Md. 1999) (<u>quoting</u> <u>Celotex</u>, 477 U.S. at 327).  <u>See</u> <u>also</u> <u>Boarman v. Sullivan</u>, 769 F. Supp. 904, 906 (D. Md. 1991).  As various courts have noted, a defendant "should not be required to undergo the considerable expense of preparing for and participating in a trial unless the plaintiff has produced evidence on which a jury might rely in support of the claims alleged."

Leskinen v. Utz Quality Foods, Inc., 30 F. Supp. 2d 530, 532 (D. Md. 1998) (quoting E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A., 678 F.Supp 567, 573 (D. Md. 1988)).

When considered in light of these standards, Plaintiff's claims clearly fail to establish the existence of any genuine issue of material fact for submission to a jury. Lucent should therefore be granted summary judgment as a matter of law.

## IV.    LUCENT SHOULD BE GRANTED SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS OF SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT

The factual underpinnings of Plaintiff's sexual harassment claim all occurred more than 300 days before Plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and her claim is therefore time-barred.  In addition, Lucent's effective remedial action following Plaintiff's complaints about Mr. Herr's conduct in 1999 establish an affirmative defense to Plaintiff's claim under Faragher, and the few incidents of which Plaintiff complains following this remedial action are simply not sufficient to give rise to a hostile work environment.  As a result, Plaintiff's claims for sexual harassment and hostile work environment under Title VII must be dismissed.

### A.    Plaintiff's Sexual Harassment Claim is Barred by the Statute of Limitations

Under Title VII, an incident that occurred over 300 days prior to a charge being filed with the EEOC is time-barred.  See 42 U.S.C. § 2000e-5(e)(1); Jackson v. Maryland, 171 F. Supp. 2d 532, 541 (D. Md. 2001); McCain v. Waste Management, Inc., 115 F. Supp. 2d 568 (D. Md. 2000).  Plaintiff may attempt to bring in conduct that occurred more than 300 days before her Charge was filed under the continuing violation theory.  Last year, however, the Supreme Court both defined and significantly limited the continuing violation theory.  See National Railroad

16

<u>Passenger Corp. v. Morgan</u>, 536 U.S. 101, 122 S. Ct. 2061 (2002).  It held that discrete acts, such as a failure to promote, each constitute a separate unlawful employment practice, and that all such discrete acts that occurred prior to 300 days from the charge being filed are time-barred. <u>See</u> <u>id</u>., 122 S. Ct. at 2073.  Conduct alleged to constitute part of the same actionable hostile work environment claim that falls outside of the limitations period can be actionable only if an act contributing to the claim occurs within the limitations period.  <u>Id.</u>, 122 S. Ct. at 2074.

Plaintiff failed to file a Charge of Discrimination with the EEOC until May 20, 2002. (*Plaintiff Depo. (Ex. A) at 155 line 15 – 156 line 6*).  As a result, even considering the potential application of the continuing violation theory, Plaintiff must be able to point to some conduct which rises to the level of sexual harassment which occurred after July 24, 2001 (300 days prior to her EEOC filing) to overcome Lucent's statute of limitations defense.  By her own admission, however, Plaintiff is unable to meet this burden.

During her deposition, Plaintiff testified at length concerning the alleged harassment by Mr. Herr and Mr. Moore.  Every incident involving Mr. Herr, however, dates back to 1998 and 1999.  <u>See</u> Statement of Facts Sections II B-C, <u>supra</u>.  The only exception was a single comment by Mr. Herr in April of 2001 when he saw Plaintiff drinking a vitamin enriched milkshake in the office kitchen and asked if she was pregnant.  (*Plaintiff Depo (Ex. A) 148 lines 14-18*).  Even assuming for the sake of argument that such a comment rises to the level of sexual harassment, this incident occurred in April of 2001, and is thus not within the 300 day limitations period.

In a similar fashion, every incident involving Mr. Moore, such as his alleged comments about Plaintiff's dress and his questions to her about the situation with Mr. Herr, occurred in 1999 and 2000.  <u>See</u> Statement of Facts Sections II C and E, <u>supra</u>.  The single exception was the volleyball incident at the Company picnic on May 11, 2001, when Mr. Moore suggested that

Plaintiff help him tackle Mr. Herr.   (*Plaintiff Depo (Ex. A) 176 line 11 – 177 line 3, 178 lines 13-17 and 181 line 8 – 182 line 11*).  Once again, however, this alleged incident occurred more than 300 days before Plaintiff's filing with the EEOC.

During her deposition, Plaintiff also alleged that she was "harassed" by two other high level managers, neither of whom ever supervised her.  Specifically, she alleged that Mr. Edward Sanford, on three occasions in 1998 and 1999, commented that Plaintiff looked "sexy," although Plaintiff never complained or asked him not to make such comments.  (*Plaintiff Depo (Ex. A) 183 line 8 –187 line 5*).  Plaintiff also claimed that Mr. Dennis Word, a manager who worked on another floor, was a pleasant man but always "spoke" to Plaintiff's breasts.  By Plaintiff's own admission, however, this also predated 2001.  (*Plaintiff Depo (Ex. A) 187 line 6 –189 line 15*).

Thus, by her own testimony, Plaintiff is unable to point to a single incident which occurred after July 24, 2001, or 300 days prior to her EEOC filing.  Plaintiff's claims for sexual harassment and hostile work environment are therefore time-barred and should be summarily dismissed.

**B.**    **Plaintiff's Sexual Harassment Allegations Related to Chris Herr Are Not Actionable Because Defendants Have Established An Affirmative Defense, and Plaintiff's Allegations After August of 1999 Are Insufficient to Give Rise to a Hostile Work Environment**

To state a hostile work environment claim based on sex, a plaintiff must show that:

(1) the harassment was unwelcome;

(2) the harassment was based on her sex;

(3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and

(4) there is some basis for imposing liability on the employer.

See Orenge v. Veneman, 218 F. Supp. 2d 758, 766 (D. Md. 2002); Finnegan v. Dept. of Public Safety & Corr. Servs., 184 F. Supp. 2d 457, 461 (D. Md. 2002).  Thus, the Plaintiff must establish not only that the conduct complained of was based on her sex, but that the "work environment was so polluted with sexual harassment that it altered the terms and conditions of her employment."  Kline v. Certainteed Corp., 205 F. Supp. 2d 468, 473 (D. Md. 2002).  Plaintiff must then establish that the conduct complained of was not only subjectively hostile or abusive, but also that it would have been objectively hostile to a reasonable person.  See Orenge, 218 F. Supp. 2d at 766.  In considering whether the harassment was severe and pervasive, the court must consider the totality of the circumstances, including:

> (1) the frequency and severity of the discriminatory conduct;
>
> (2) whether the conduct was physically threatening or humiliating, or mere offensive utterance; and
>
> (3) whether the conduct unreasonably interferes with the employee's work performance.

See Orenge, 218 F. Supp. 2d at 767; Finnegan, 184 F. Supp. 2d at 462.

With respect to the final element of a hostile work environment, the standard for imposing liability on the employer depends upon who is alleged to have done the harassment. When the harassment is carried out by a supervisor, the employer may be held vicariously liable on agency principles if the harassment results in a tangible employment action.  However, where no tangible employment action results from the harassment, the employer may establish an affirmative defense which consists of two elements: (1) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Church v. State of Maryland, 180 F. Supp. 2d 708,

7272 (D. Md. 2002) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275 (1998)).

In the present matter, it is undeniable that Mr. Herr's comments to Plaintiff from October of 1998 to August of 1999, if true as alleged by Plaintiff, constituted conduct which was inappropriate and offensive.  It is equally undeniable, however, that following Plaintiff's complaint, Lucent immediately took effective remedial action under its published sexual harassment policy.[8]  At Plaintiff's request, she was removed from Mr. Herr's supervision; Mr. Herr was reprimanded and warned that any further infractions would lead to termination; and Mr. Herr was sent to three days of training and counseling.  (*Plaintiff Depo. (Ex. A) at 48 line 16 – 49 line 15; Herr Depo. (Ex. C) at 141 line 11 – 142 line 10, 144 line 7 – 145 line 5, and 147 line 4 – 148 line 18*).  Lucent thus exercised reasonable care to prevent and promptly correct the inappropriate behavior by Mr. Herr.  Church, 180 F. Supp. 2d at 736-8.

Plaintiff, however, never sought any additional corrective action with respect to Mr. Herr's conduct in 1999; to the contrary, as Plaintiff herself conceded in her deposition, she did not want Mr. Herr fired as a result of the 1999 incidents, and she never asked Lucent to transfer Mr. Herr to another office.  (*Plaintiff Depo. (Ex. A) at 164 line 21 – 165 line 8*).  Given that no tangible employment action resulted from Mr. Herr's comments in 1999,[9] Lucent is able to establish a complete affirmative defense as to any claim of harassment arising from incidents involving Mr. Herr prior to September of 1999.  Church, 180 F. Supp. 2d at 738.

---

[8] Plaintiff was well aware of the existence and nature of this policy.  (*Plaintiff Depo. (Ex. A) at 70 lines 2-9, 71 line 4 – 72 line 6, 78 line 17  – 79 line 2 and Exhibit 4*).

[9] To the contrary, during this period, Mr. Herr actually facilitated and approved Plaintiff's promotion from an A-2 account manager to an A-4 account manager, and provided Plaintiff, by her own admission, with a very good performance evaluation even after she had made her complaint and was transferred from his supervision.  (*Plaintiff Depo. (Ex. A) at 47 line 20, 48 line 9, 160 lines 14-21 and 161 lines 10-17*).

With respect to Plaintiff's allegations of harassment after this period, such allegations simply are not severe or pervasive enough to rise to the level of creating an abusive work environment. Specifically, Plaintiff alleges that Mr. Herr in April of 2001 commented about a vitamin milkshake and Plaintiff being pregnant; that Mr. Moore in May of 2001 made a joke about tackling Mr. Herr at a company picnic; and that two other managers, who did not supervise Plaintiff, on several occasions commented on how she looked or failed to make eye contact while speaking to her (incidents, by the way, which Plaintiff never even complained about prior to filing her lawsuit). This type of sporadic conduct by different individuals over a number of years was neither frequent nor severe, was not physically threatening, and simply did not create a "work environment so polluted with sexual harassment that it altered the terms and conditions of her employment." Kline v. Certainteed Corp., 205 F. Supp. 2d 468, 473 (D. Md. 2002); Francis v. Board of School Commissioners of Baltimore City, 32 F. Supp. 2d 316, 324-5 (D. Md. 1999). As a result, Plaintiff's claim for sexual harassment and hostile work environment should be dismissed.

## V.     LUCENT SHOULD BE GRANTED SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS OF GENDER DISCRIMINATION AND RETALIATION

Plaintiff next claims that she were discriminated against on the basis of her gender and retaliated against by Lucent. As she has not produced any direct evidence of discriminatory or retaliatory motive by Lucent, Plaintiff's claims of gender discrimination and retaliation are analyzed under the familiar burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Nichols v. Harford County Board of Education, 189 F. Supp. 2d 325, 340-1 and 343-4 (D. Md. 2002); Chika v. Planning Research Corp., 179 F.Supp.2d 575, 580-1 (D. Md. 2002). Under this scheme, Plaintiff must first establish by a preponderance

of the evidence a prima facie case of discrimination and/or retaliation. "This initial showing requires the plaintiff to produce 'a set of facts which would enable the fact-finder to conclude with reasonable probability that in the absence of any further explanation, the adverse employment action was the product of [gender] discrimination [or retaliation].'" Nichols v. Harford County, 189 F. Supp. 2d at 340 (D. Md. 2002) (citing Mitchell v. Data General Corp., 12 F.3d 1310, 1315 (4th Cir. 1993)).

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show legitimate, non-discriminatory and/or non-retaliatory reasons for its actions. The defendant's burden is one of production, not persuasion. See Chika, 179 F.Supp.2d at 581; Nichols v. Harford County, 189 F. Supp. 2d at 340-1. If the defendant produces this evidence, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were a mere pretext for intentional and prohibited discrimination and/or retaliation. See Langerman v. Thompson, 155 F.Supp.2d 490, 496 (D.Md. 2001); Chika, 179 F.Supp.2d at 581.

In the present matter, Plaintiff is unable to establish a prima facie case of either gender discrimination or retaliation, and likewise cannot prove that Lucent's legitimate, non-discriminatory and non-retaliatory reasons for its actions were a mere pretext for intentional discrimination or retaliation. As a result, judgment should be entered in favor of Lucent and against Plaintiff on her claims of gender discrimination or retaliation as a matter of law.

A.    **Plaintiff is Unable to Establish a Prima Facie Case of Gender Discrimination**

In order to establish a prima facie case of gender discrimination, the Plaintiff must establish that:

(1) the employee is a member of a protected class;

(2) the employee was qualified for the job and her performance
was satisfactory;

(3) in spite of her qualifications and performance, the employee
suffered an adverse employment action; and

(4) the employee was treated differently from similarly situated
employees.

See Finnegan, 184 F. Supp. 2d at 461.

Plaintiff, however, is unable to establish that she ever suffered a legally cognizable adverse employment action.  It is well settled that Title VII's protections extend only to adverse employment actions.  See Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985) ("employment discrimination laws require as an absolute precondition to suit that some adverse employment action has occurred"), cert. denied, 475 U.S. 1082 (1986).  As the Courts have noted, "[e]mployer conduct amounts to an adverse employment action if it 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  Nichols v. Comcast Cablevision of Maryland, 84 F. Supp. 2d 642, 654 (D. Md. 2000) (quoting Bulington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  In attempting to point to an actionable adverse employment action, Plaintiff's case quite simply fails.

Plaintiff concedes that there was never a job at Lucent for which she applied and was denied.  (*Plaintiff Depo (Ex. A) at 259 line 19 –260 line 1*).  To the contrary, Plaintiff received a level promotion, approved by Mr. Herr, from an A-2 account manager to an A-4 account manager in early summer of 1999.  (*Plaintiff Depo. (Ex. A) at 47 line 20, 48 line 9 and 161 lines 10-17*).  Plaintiff's objection appears to be that she failed to receive another level promotion in the two years before she abruptly resigned.  As Plaintiff herself put it:

> Before that I was flat.  There was no advancement.  I was
> just flat.  I was – my career path was apparently very flat.
> (*Plaintiff Depo (Ex. A) at 266 lines 4-7*).

Not advancing as quickly as one might like, however, particularly during the midst of an economic downturn and company-wide downsizing, is a far cry from being fired, or being denied a specific and concrete promotion, or any other significant change in employment status. Plaintiff's argument would mean that anytime an employee subjectively felt that they were not advancing quickly enough in their job, they would have suffered an adverse employment action. This type of conclusory and self-serving assertion is simply not sufficient to establish an adverse employment action and defeat summary judgment.  See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 960 (4th Cir. 1996).  As this Court has previously noted: "[a]lthough actions short of termination may constitute an adverse employment action within the meaning of [Title VII] … not everything that makes an employee unhappy is an actionable adverse action." Settle v. Baltimore County, 34 F.Supp.2d 969, 989 (D. Md. 1999).

Plaintiff's lack of advancement, however, seems to be merely part of her general claim that she was forced to resign.  As Plaintiff finally explained after extensive questioning:

> Q:    What action was taken against you?
> A:    The action that was taken against me was that my job was
>        taken away from me.
> …
> Q:    Okay.  And in terms of the concrete adverse actions that
>        were taken against you in retaliation for making complaints,
>        would those be the same that you've described in terms of
>        your gender discrimination complaint, specifically that your
>        career flat-lined and that you were ultimately removed from
>        your position, forced to take a technical consultant position,
>        and ultimately resigned?
> A:    That's correct.  (*Plaintiff Depo. (Ex. A) at 200 lines 3-5 and
>        280 line 19 – 281 line 7*).

To establish the occurrence of an adverse action, Plaintiff thus must establish that, as a matter of law, she was constructively discharged by Lucent. Constructive discharge occurs "when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." Nichols v. Harford County, 189 F. Supp. 2d at 345 (citations and quotations omitted). In order to establish constructive discharge, a plaintiff must prove both: (1) deliberateness of the employer's action; and (2) intolerability of working conditions. See id. (citing Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)). With respect to the first element, a plaintiff must present "proof of the employer's specific intent to force the employee to leave." Bristow, 770 F.2d at 1255. With respect to the second element, whether the plaintiff's working conditions were intolerable "is assessed by the objective standard of whether a reasonable person in the plaintiff's position would have felt compelled to resign." Id. See also Nichols v. Harford County, 189 F. Supp. 2d at 346 (quoting Taylor v. Virginia Union University, 193 F.3d 219, 237 (4th Cir. 1999)).

As to the first element of a constructive discharge claim, Plaintiff has no evidence whatsoever that either Mr. Moore or Ms. Worley, Plaintiff's supervisors and the decision-makers at the time of her resignation, had any "specific intent" to force her to leave Lucent. To the contrary, had Mr. Moore or Ms. Worley wished to "force" Plaintiff out, they could have included her in any of the three downsizings on the Verizon team in February, March or August of 2001. The undisputed evidence, however, establishes that Plaintiff was never once in jeopardy of losing her job during these downsizings, and that, at the time of her resignation in September of 2001, Plaintiff had in fact safely made it through all three rounds of layoffs on the Lucent Verizon team. (*Moore Depo. (Ex. B) at 152 line 16 – 153 line 11 and 225 line 18 – 226 line 3*).

In response, Plaintiff weakly asserts that she was being forced into a technical consultant position, and that the technical consultants were the first in line for layoff. (*Plaintiff Depo. (Ex. A) at 264 lines 6-18, 297 lines 7-21 and 299 line 14 – 300 line 2*). Plaintiff has nothing more to support this assertion, however, than her own self-serving assumptions. The undisputed evidence establishes that, as a result of the early retirement offer in the summer of 2001, the Lucent Verizon team had lost 75% of its technical consultants, and had a desperate need to fill these "holes." (*Moore Depo. (Ex. B) at 222 line 19 - 223 line 9; Worley Depo. (Ex. D) at 140 lines 2-6*). By Plaintiff's own admission, her main failing was a lack of a technical background, and Mr. Moore had specifically told her that additional technical experience would be helpful if she wished to advance. (*Plaintiff Depo. (Ex. A) at 35 line 15 – 36 line 3 and 267 lines 7-9*). The technical consultant position would have been a lateral move for Plaintiff, without any decrease in compensation, and represented a perfect chance for Plaintiff to gain the technical expertise she needed to advance her career. (*Moore Depo. (Ex. B) at 222 line 17 – 223 line 16; Worley Depo. (Ex. D) at 142 lines 3-13*). This hardly constitutes specific intent on the part of Lucent to "force" Plaintiff to resign.[10]

As to the second element of a constructive discharge claim, Plaintiff's subjective perception that her working conditions at the time of her resignation were intolerable is not enough to defeat summary judgment. As the courts of this District and Circuit have held, "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or

---

[10] Plaintiff's decision to resign was also impacted by the second-hand information she received from Ms. Bryan, who told Plaintiff that Lucent Public Relations Manager Denise Panyick-Dale had said that Plaintiff's job was in jeopardy. As already discussed, however, all Ms. Panyick-Dale ever said to Ms. Bryan was that, with so much downsizing going on, no one was "safe;" she never told Ms. Bryan that Plaintiff's job was in jeopardy or that Plaintiff had been marked for downsizing. (*Panyick-Dale Depo. (Ex. F) at 25 line 12 – 27 line 6*). This unsubstantiated hearsay thus cannot constitute specific intent on the part of either Mr. Moore or Ms. Worley to force Plaintiff to leave.

unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."

Nichols v. Harford County, 189 F. Supp. 2d at 346 (quoting Taylor, 193 F.3d at 237).  As the

Fourth Circuit wrote in Bristow:

> [T]he law does not permit an employee's subjective
> perceptions to govern a claim of constructive discharge.  Every
> job has its frustrations, challenges and disappointments; these
> inhere in the nature of work. An employee is protected from a
> calculated effort to pressure him into resignation through the
> imposition of unreasonably harsh conditions, *in excess of those
> faced by his co-workers*. He is not, however, guaranteed a
> working environment free of stress.  The employment
> discrimination laws require as an absolute precondition to suit
> that some adverse employment action have occurred. They
> cannot be transformed into a palliative for every workplace
> grievance, real or imagined, by the simple expedient of
> quitting.

770 F.2d at 1255 (emphasis added).

Plaintiff may have felt frustrated and stymied in her career progression at Lucent at the

time of her resignation, but with downsizings occurring on a constant basis, 2001 was a difficult

time for each and every Lucent employee.  Plaintiff may have felt that her career had "flat-

lined," but "speculation concerning future career progression" is not sufficient to establish

intolerable working conditions.  See McGee v. Danzig, 2001 WL 410052, *13 (D. Md. 2001)

(quoting Jurgens v. EEOC, 903 F.2d 386, 392 (5th Cir. 1990)).  See also McCain, 115 F. Supp.

2d at 576 (noting that "dissatisfaction with [among other issues]… work related stress and

promotion opportunities" does not rise to the level of intolerable working conditions).  From an

objective standpoint, Plaintiff had received a promotion from an A-2 level account manager to an

A-4 level account manager a mere two years earlier; she was not downsized like countless

numbers of her co-workers; and Mr. Moore was actually trying to move her into a position for

the purpose of providing her with the technical expertise she needed to advance. From an objective standpoint, Plaintiff's claim of constructive discharge thus fails as a matter of law.

Along these same lines, it should also be recognized that Plaintiff is unable to establish a prima facie case of gender discrimination for a second reason: namely, she is unable to show that she was treated differently from similarly situated employees. With respect to her constructive discharge claim, Plaintiff has pointed to no similarly situated individuals who were treated better than she, unsurprising given the fact that virtually every Verizon team member was equally concerned over their jobs during this period of massive downsizing. Plaintiff also concedes that, after her resignation, her job duties were passed along to Ms. Toby Adams, a woman. (*Plaintiff Depo. (Ex. A) at 255 line 19 –256 line 11*). Such circumstances make it exceedingly difficult for Plaintiff to establish a prima facie case of gender discrimination based on her alleged constructive discharge, particularly given the fact that her direct supervisor at the time of her resignation, Ms. Worley, was a woman as well.

As to her allegation that she was not promoted to an A-5 level account manager position fast enough, Plaintiff is able to point to only two male employees, Marcello Barros and Paul Kates, who received A-5 level promotions during this same period. (*Plaintiff Depo. (Ex. A) at 280 line 19 – 281 line 7 and 290 lines 3-16*). Mr. Barros and Mr. Kates, however, were simply not similarly situated to Plaintiff. Both had Masters of Business Administration degrees ("MBA"), a degree which Plaintiff did not possess, and both were ranked significantly higher than Plaintiff among the Verizon team A-level managers. (*Moore Affidavit (Ex. E) at ¶¶ 6 and 8*). Both were in direct sales, as opposed to sales support like Plaintiff. (*Moore Affidavit (Ex. E) at ¶7*). Most importantly, neither were under the supervision of either Mr. Moore or Ms. Worley. (*Moore Affidavit (Ex. E) at ¶5*). Plaintiff is thus unable to establish that she was treated

28

differently than other <u>similarly</u> <u>situated</u> employees as Lucent, and her claim of gender discrimination fails at the prima facie level as a matter of law.

### B.  <u>Plaintiff is Unable to Establish a Prima Facie Case of Retaliation</u>

The essential elements of a prima facie case of retaliation are well known:

> (1) Plaintiff engaged in a protected activity;
>
> (2) The employer took an adverse action against the plaintiff; and
>
> (3) A causal connection exists between the protected activity and the adverse action.

<u>See</u>, <u>e.g.</u>, <u>Nichols</u>, 189 F. Supp. 2d at 343; <u>Church</u>, 180 F. Supp. 2d at 744.  <u>See also</u> <u>Hopkins v. Baltimore Gas & Electric Co.</u>, 77 F.3d 745, 754 (4th Cir. 1996).  Plaintiff's inability to establish the existence of a legally sufficient adverse action has already been discussed in detail as to Plaintiff's claim of gender discrimination, and Plaintiff's claim for retaliation fails at the prima facie level under this same analysis.  Even if she were able to establish that Lucent took a legally cognizable adverse action against her, however, Plaintiff's claim of retaliation still fails due to her inability to establish a causal connection between any protected activity and any alleged adverse action.

In order to establish a causal connection, Plaintiff must establish that Lucent took adverse action against her "because [she] engaged in a protected activity."  <u>See</u> <u>Nichols</u>, 189 F. Supp. 2d at 344 (quoting <u>Dowe v. Total Action Against Poverty in Roanoke Valley</u>, 145 F.3d 653, 657 (4th Cir. 1998)).  This Court has noted that what constitutes a causal connection "depends largely on the particular facts and circumstances of the case," and that factors "may include temporal proximity between the two events, an intervening pattern of retaliatory conduct, inconsistent reasons by the employer for the adverse action, and differential treatment of other employees."  <u>Id</u>. (citation omitted).  In the present matter, however, none of these factors are present.

As already discussed, Plaintiff is unable to point to any differential treatment between Plaintiff and other similarly situated individuals.  Plaintiff also has no evidence of "inconsistent reasons" offered by Lucent for any alleged adverse action (assuming, of course, that any legally cognizable adverse action even occurred).  In addition, no "intervening pattern of retaliatory conduct" occurred between Plaintiff's complaints about Mr. Herr in 1999 and the alleged "flat-lining" of her career and her claimed constructive discharge in 2001.  To the contrary, Plaintiff herself admitted that no such conduct occurred between her complaints about Mr. Herr in 1999 and her alleged problems with Ms. Worley and Mr. Moore in 2001.  Plaintiff has absolutely no complaints about the intervening year and a half while she was under the supervision of Mr. McFaul and Mr. Donaldson; in fact, she even refers to Mr. Donaldson as "a great boss." (*Plaintiff Dep. (Ex. A) at 52 lines 1-16 and 57 line 6-20*).  Such a lengthy intervening period devoid of retaliatory issues significantly undermines Plaintiff's claim of a causal connection.

The final <u>Nichols</u> factor to consider is temporal proximity.  As to Plaintiff's complaints about Mr. Herr, however, the evidence is clear that Mr. Moore spoke with Plaintiff in the Fall of 1999 about her difficulties with Mr. Herr, and had at least a general understanding of her complaints at this time.  (*Moore Depo. (Ex. B) at 21 line 13 – 24 line 14 and 25 line 9 – 26 line 8*).  Plaintiff's allegations of retaliation do not begin until 2001, almost a year and a half after Mr. Moore had knowledge of Plaintiff's complaints against Mr. Herr.  "[A] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action … negates any inference that a causal connection exists between the two." <u>Church</u>, 180 F. Supp. 2d at 745 (<u>quoting</u> <u>Dowe</u>, 145 F.3d at 657) and cases cited therein.[11]

---

[11] Moreover, during the intervening period between Mr. Moore learning of Plaintiff's complaints about Mr. Herr and the issues of 2001, far from taking any retaliatory action against Plaintiff, Mr. Moore actually provided Plaintiff with

Plaintiff also asserts that she was retaliated against for complaints she made to Human Resources during 2001 about Mr. Moore and Ms. Worley.  Mr. Moore and Ms. Worley, however, were utterly unaware of any complaint made by Plaintiff against them to Human Resources or otherwise.  (*Moore Depo. (Ex. B) at 218 lines 11-21; Worley Depo. (Ex. D) at 67 line 19 – 68 line 1*).  Plaintiff is therefore unable to rely upon these complaints in attempting to establish a relevant causal connection.  See <u>Dowe v. Total Action Against Poverty in Roanoak Valley</u>, 145 F.3d 653, 657 (4th Cir. 1998) ("[s]ince, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case [of retaliation]"); <u>Orenge</u>, 218 F. Supp. 2d at 765-6 (failure to show knowledge of protected activity preventes the establishment of causal connection).  See also <u>Grizzle v. Travelers Health Network, Inc.</u>, 14 F.3d 261, 267 (5th Cir. 1994) (dismissing retaliation claim based upon a lack of evidence that the relevant decision-maker knew plaintiff had complained of discrimination).

Plaintiff's only remaining basis for attempting to establish a causal connection between any alleged protected activity and any alleged adverse employment action thus seems to be her discussions about an alleged inappropriate relationship between Mr. Moore and Ms. Hanlon. Even assuming that such "complaints" rise to the level of protected activity under Title VII, Plaintiff is unable to put forward a single shred of evidence that her comments to and about Mr. Moore and Ms. Hanlon had anything whatsoever to do with her purported lack of advancement at Lucent or with the circumstances of her alleged constructive discharge.  The mere fact that a

---

career counseling and mentoring.  (*Plaintiff Depo. (Ex. A) at 173 lines 13-19; Moore Depo. (Ex. B) at 34 lines 9-17 and 38 lines 1-19*).

Plaintiff makes a complaint about an issue "does not, in and of itself, create a reasonable inference that everything that happened after that point, which the Plaintiff did not like, was caused by the fact that he had filed his complaint." Chappell v. School Board of the City of Virginia Beach, 12 F. Supp. 2d 509, 517 (E.D. Va. 1998). Without any evidence to link her "complaints" about Mr. Moore and Ms. Hanlon with any adverse action, Plaintiff is unable to meet her prima facie obligation of proving a causal connection, and her retaliation claim therefore fails as a matter or law.

**C.    Plaintiff is Unable to Establish that Lucent's Legitimate, Non-Discriminatory and Non-Retaliatory Reasons for its Actions were Mere Pretext for Either Intentional Gender Discrimination or Retaliation**

Even if Plaintiff could establish a prima facie case of either gender discrimination or retaliation, Lucent has clearly put forward legitimate, nondiscriminatory and non-retaliatory reasons for not promoting Plaintiff to a higher level more quickly, and the undisputed facts show that Plaintiff left Lucent voluntarily to take a better-paying job. Plaintiff's job was never in jeopardy; her career was never "flat-lined" (although she admittedly lacks a technical background and/or a masters degree); and Lucent had a legitimate need to move employees into open technical consultant positions. With such legitimate reasons articulated, Plaintiff bears the burden of showing that Lucent's proffered reasons for its actions were not its true reasons, but were a mere pretext for intentional and prohibited gender discrimination and/or retaliation. See Langerman v. Thompson, 155 F.Supp.2d 490, 496 (D.Md. 2001); Chika, 179 F.Supp.2d at 581. In attempting to meet this burden, however, Plaintiff has woefully failed, and her claims should therefore be dismissed as a matter of law.

As to her claim of gender discrimination, Plaintiff is unable to point to any comments or statements by either Mr. Moore or Ms. Worley, the relevant decision-makers, which even

suggest a hint of gender bias.  Instead, as revealed by her own testimony, Plaintiff expressly

relies upon her own subjective beliefs that Mr. Moore and Ms. Worley were acting in a

discriminatory fashion.  In speaking about her lack of career advancement, for example, Plaintiff

herself testified:

> A:    In a meeting she [Ms. Worley] told me, when we were
>        discussing my B level promotion, it took her ten years to get
>        to her position, I wasn't going to get it that quickly.  To me
>        it's because I'm a young woman someone says that to me…
>
> Q:    Did she say that your gender had anything to do with your
>        potential for advancement?
>
> A:    Not directly.
>
> Q:    Did she say it indirectly?
>
> A:    Yes.
>
> Q:    How?
>
> A:    By saying to me that because of who I am it would take me
>        just as long to get there as she did.  She was not going to –
>        that's my interpretation.  But my opinion was that she was
>        not going to support me in advancing my career.  (*Plaintiff
>        Depo. (Ex. A) at 235 line 21 – 237 line 10*).

In a similar vien, while testifying about her alleged constructive discharge, Plaintiff stated

that: "I believe that it [having her job "taken away"] was a direct result of me being a woman…"

(*Plaintiff Depo. (Ex. A) at 200 lines 13-14*).  Such speculation is simply not enough to defeat

summary judgment.  See Evans v. Technologies Application & Service Co., 80 F.3d 954, 959

(4th Cir. 1996) ("Plaintiff's own naked opinion, without more, is not enough to establish"

discrimination); Dachman v. Shalala, 46 F.Supp.2d 419, 440 (D. Md. 1999) ("a subjective belief

of discrimination, however genuine, [cannot] be the basis of judicial relief").  Again, however,

the undisputed facts show that Plaintiff's job was not "taken away."

As to her claim of retaliation, Plaintiff is likewise unable to establish that Lucent's

legitimate reasons for its actions were a mere pretext for retaliation.  In fact, Plaintiff appears to

have no evidence other than her perceived difficulties working with Mr. Moore and Ms. Worley,

and the temporal proximity between her alleged constructive discharge and her "complaints" about Mr. Moore and Ms. Hanlon.  On the first issue, however, this Court has specifically noted that: "since supervision and [retaliation] are very different … a [retaliatory] animus cannot be inferred from the day-to-day conduct of supervisors that [plaintiff] may deem inconvenient, inconsiderate or insufficiently solicitous."  Settle v. Baltimore County, 34 F. Supp. 2d 969, 993 (D. Md. 1999) (quoting Copeland v. Sears, Roebuck and Co., 25 F. Supp. 2d 412, 418 (S.D.N.Y. 1998)).  On the second issue, the Fourth Circuit has noted that "temporal proximity… is simply too slender a reed on which to rest a … [retaliation] claim."  Wagner v.Wheeler, 13 F.3d 86, 91 (4th Cir. 1993).  Plaintiff thus has no legally sufficient basis for alleging retaliatory animus on the part of Lucent.  See Gibson v. Old Town Trolley Tours, 160 F.3d 177, 182 (4th Cir. 1988) (citation and quotation omitted) ("[a] jury may… not be allowed to infer [retaliation] from evidence that does no more than suggest it as a possibility").

In the final analysis, it is also critical to remember that Plaintiff was never fired by Lucent, but rather chose to voluntarily resign at the urging of Ms. Bryan.  The undisputed evidence clearly establishes that Plaintiff considered her new position at Signal "a positive move towards fulfilling my career goals;" that she was leaving for a "better salary;" and that her new job was simply (in her own words) a "better opportunity."  (*Plaintiff Depo. (Ex. A) at 301 lines 7-18, 302 lines 1-5, 305 line 3 – 306 line 8 , 309 line 15 – 311 line 2 and Exhibits 9-11; Worley Depo. (Ex. D) at 62 lines 2-14*).  In sum, Plaintiff has come forward with absolutely no facts to support her claim of constructive discharge, and such allegations should be dealt with summarily.

## VI.    CONCLUSION

For the foregoing reasons, Lucent's Motion for Summary Judgment should be granted in its entirety and judgment should be entered in favor of Lucent and against Plaintiff as a matter of law.

Respectfully submitted,


_____/s/_____
Robert R. Niccolini
McGuireWoods LLP
7 St. Paul Street, Suite 1000
Baltimore, Maryland 21202
410-659-4400

Counsel for Lucent Technologies Inc.

**APPENDIX OF EXHIBITS**

| Ex. No. | Description |
|---------|-------------|
| A | Select Portions of the Deposition of Plaintiff |
| B | Select Portions of the Deposition of Tom Moore |
| C | Select Portions of the Deposition of Chris Herr |
| D | Select Portions of the Deposition of Pam Worley |
| E | Affidavit of Tom Moore |
| F | Select Portions of the Deposition of Denise Panyick-Dale |

\\LAB\367017.1

37